# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 3, 2011

## STATE OF TENNESSEE v. REGINOLD STEED

**Direct Appeal from the Circuit Court for Madison County**
**No. 09-549      Donald H. Allen, Judge**

**No. W2010-01829-CCA-R3-CD  - Filed July 19, 2011**

A Madison County Circuit Court jury convicted the appellant, Reginold Steed, of aggravated assault, and the trial court imposed a sentence of four years and six months in the Tennessee Department of Correction.  On appeal, the appellant challenges the sufficiency of the evidence underlying his conviction, the length of the sentence imposed by the trial court, and the trial court's denial of judicial diversion and alternative sentencing.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined.  DAVID H. WELLES, J., not participating.

Clifford K. McGown, Jr., Waverly, Tennessee (on appeal), and George Morton Googe and Gregory D. Gookin, Jackson, Tennessee (at trial and on appeal), for the appellant, Reginold Steed.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; James G. Woodall; District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

At trial, the victim, Lawrence George Hendrix, Jr., testified that around 9:00 or 10:00 p.m. on the night of May 22, 2009, he and Josh McDaniel went to a night club in Jackson. At the club, Hendrix drank approximately fifteen beers and a Long Island iced tea, which is a cocktail containing "several different liquors mixed with . . . Coke."  Hendrix believed

McDaniel drank approximately the same amount of alcohol. Hendrix recalled that he took some prescription medication that night, specifically chlorazepam to treat his anxiety and seroquel to treat his bipolar disorder. He acknowledged that he was not supposed to drink alcohol after taking his medication.

Between 12:30 a.m. and 1:30 a.m., Hendrix and McDaniel left the club and went to a McDonald's restaurant on the Highway 45 bypass in Madison County to get "something to eat to kind of sober up." McDaniel was driving his red truck and Hendrix was in the passenger seat. They went through the drive-thru. Hendrix said that as they neared the "pay window," McDaniel "bumped" into the white car in front of them. Hendrix stated that McDaniel "didn't hit him hard, he just barely tapped him."

Hendrix said three African-American males got out of the car; one was the appellant, who was driving, and the other two were passengers. He later learned that the two passengers were juveniles. Once out of the car, the three males began "talking smack" and cursing. Hendrix said that the males were using "racial slurs," calling Hendrix "white boy." In response, Hendrix made "some racial slurs," referring to the males as "[n]iggers." Hendrix said that because he had raised McDaniel after his uncle died, he went "on the offensive," and told them to get back into the car. They refused and continued cursing. The juveniles approached McDaniel's truck and hit Hendrix on the right side of his face through the passenger-side window. The appellant, who had been walking behind the juveniles, jumped back in the car and pulled it forward. Hendrix stated that he did not recall kicking the appellant's car.

Hendrix said that after he was hit, he got out of the truck to chase the juveniles. Hendrix explained that he wanted to hit the juveniles because he was

frustrated. When Hendrix caught one of the juveniles, the appellant grabbed Hendrix from behind and "yanked" him off his feet. Hendrix saw the three males surround him, and he "balled up" on the ground. Hendrix was kicked numerous times in the face and ribs.

Hendrix ultimately "blacked out" and later woke in the hospital. Testing revealed that he had a broken jaw, facial fractures, broken eye sockets, and swelling around his eyes. He also had various bruises to his body. Doctors were unable to treat his eyes for approximately a month because of bleeding in his eyes. Hendrix said that his eyes ached for approximately six months after the beating, and he was given pain medication. His pain eventually went away. Doctors told Hendrix that he needed surgery to fix his broken facial bones, but he refused surgery. He said that he had "blackness" around his eyes that was possibly permanent.

Josh McDaniel testified that in the early morning hours of May 23, 2009, he and Hendrix were at the Mix Factory in Jackson. McDaniel recalled that the beer was free and that they each drank approximately six or seven cups of beer. When they left the night club, they were hungry and went to McDonald's. McDaniel said he was driving his 1998 Dodge truck. After placing their order, McDaniel drove toward the pay window of the drive-thru. The appellant's car was at the window, and McDaniel "bumped" into the car, "like a little nudge." He said that he did not know the people in the car.

McDaniel said that after he hit the appellant's car, two young men who were passengers got out of the car. The two males approached McDaniel's truck and started "mouthing to us and . . . Hendrix was mouthing back." McDaniel did not hear Hendrix use any racial slurs. McDaniel said that one of the young men punched Hendrix in the face through the passenger-side window. The young men started walking back to the car. Hendrix got out of the truck and approached the car. McDaniel said that after the three males got their food, the car "pulled off," and Hendrix started walking back toward the truck. McDaniel did not see Hendrix kick the appellant's car. As McDaniel drove forward to pay for his food, he looked to the right and saw Hendrix on the ground "being jumped by three men," the appellant and two juveniles. McDaniel said that all three kicked and stomped Hendrix's face and ribs. McDaniel thought the beating lasted about five minutes.

McDaniel got out of his truck to check on Hendrix, and the three men ran away. McDaniel said Hendrix "was in and out of it." Hendrix's face was bloody, his nose was broken, and his eyes were swollen shut.

Jackson Police Officer Steven Story testified that around 1:00 a.m., he responded to a report of a fight at McDonald's. Upon arriving at the scene, he saw Hendrix lying face-down in a pool of blood in the parking lot. Officer Story stated that Hendrix was "semiconscious" and had severe facial injuries. His eyes were completely swollen shut . . . [and there was] a lot of blood around the mouth and nose." Hendrix was not able to tell Officer Story what happened because "[h]is words were blurred from the blood." Officer Story called for an ambulance which transported Hendrix to the emergency room at Jackson General Hospital for treatment. Testing at the hospital revealed that Hendrix's blood alcohol content was .20.

Officer Nicholas Donald stated that around 1:00 or 2:00 a.m., he heard Officer Story issue a "BOLO" for an assault suspect who was driving a white Crown Victoria. Officer Donald saw the appellant driving a car matching that description on the corner of Stonewall and Farris. When Officer Donald turned his patrol car around to stop the appellant's car, one of the appellant's passengers jumped out of the car and fled. Officer Donald did not give chase and instead approached the car to speak with the appellant.

-3-

Officer Donald told the appellant that he had been stopped because he was suspected of an assault at McDonald's. The appellant acknowledged that he had been at McDonald's but stated that he had not taken part in an assault. Officer Donald said that when the appellant got out of the car, he observed specks of blood on the appellant's shoes. After Officer Donald asked about the blood, the appellant did not respond but "tried to scrape the blood off of his shoes on the pavement." Officer Donald then took the appellant into custody.

The appellant chose not to put on any proof. Based upon the foregoing, the jury found the appellant guilty of aggravated assault. The trial court sentenced the appellant to four and a half years in the Tennessee Department of Correction. The court denied the appellant's request for judicial diversion. Further, the court denied the appellant's request for alternative sentencing.

On appeal, the appellant challenges the sufficiency of the evidence underlying his conviction, the length of the sentence imposed by the trial court, and the court's denial of judicial diversion and alternative sentencing.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

As charged in the indictment, aggravated assault occurs when a person intentionally or knowingly causes serious bodily injury to another person. Tenn. Code Ann. §§ 39-13-102(a)(1)(A), -101(a)(1). The proof adduced at trial reflects that after McDaniel accidentally "bumped" his truck into the appellant's car, the appellant's juvenile passengers

got out of car and approached the truck. The juveniles and Hendrix argued, all of them using "racial slurs," and the juveniles hit Hendrix through the passenger-side window. The juveniles walked off, and Hendrix got out of the truck to follow them. When Hendrix caught one of the juveniles, the appellant pulled him away, knocking him to the ground. Hendrix curled into a fetal position on the ground, and the appellant and the two juveniles kicked and stomped Hendrix's face and ribs. Hendrix lost consciousness and was taken to the hospital where he was treated for a broken jaw, facial fractures, broken eye sockets, swollen eyes, and body bruises. His eyes bled for a month. He was in pain for approximately six months. Hendrix was advised that he needed facial surgery, but he refused. Hendrix said that he had "blackness" around his eyes that was possibly permanent. From the foregoing, a reasonable jury could have found the appellant guilty of aggravated assault.

The appellant maintains that because Hendrix acknowledged that he had taken prescription medication and consumed a large amount of alcohol on the night of the assault, his recollection of the events and his credibility were questionable. Moreover, the appellant asserts that Hendrix "used racial slurs" which "should serve to reduce the culpability associated with an assault." It is well-settled that the credibility of witnesses is determined by the jury, not by the appellate courts. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). In the instant case, the jury heard the proof at trial and, acting within its purview, accredited the testimony of the State's witnesses. The jury also apparently determined that if Hendrix's use of racial slurs played a part in the altercation, his behavior did not warrant the severity of the beating doled out by the appellant. This issue is without merit.

## B. Sentencing

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

At the sentencing hearing, the appellant testified that he was eighteen years old at the time of the assault. He said that on April 23, 2009, he was convicted as an adult for resisting a stop and frisk and was given six months of probation. His probation was revoked when he was convicted of the aggravated assault. The appellant stated that as a juvenile, he was adjudicated delinquent for possession of crack cocaine with the intent to sell and was given intensive probation. Additionally, when he was fourteen, he was adjudicated delinquent for assault and disorderly conduct.

The appellant said that he attended Liberty Technology Magnet High School where he played football for three years. He stated that he did not play his senior year because he was "kicked off" the team due to the aforementioned drug charge. Nevertheless, the appellant graduated high school. He stated that he had completed a semester at Lane College and planned to return to college upon his release from custody.

The appellant said that he was with two juveniles when the fight started and acknowledged that he "at least kick[ed Hendrix] a few times." He stated that he knew Hendrix had been seriously injured. The appellant maintained that he did not intend to get into a fight but stated that his car was struck first. The appellant said that he did not want to call the police after his car was hit because he could tell both Hendrix and McDaniel were intoxicated. He intended to ask McDaniel for money to repair his trunk, but "things got out of hand."

The appellant said that if the court granted him diversion he would "[g]o back to school and probably switch my major over to criminal justice and be a lawyer and go back to work." He stated that at the time of the offense, he was working at an Olive Garden restaurant. He said he had previously worked at O'Charley's restaurant and a Backyard Burger restaurant. He had also worked at a Sonic restaurant, but his employment was terminated because he stole food.

The appellant stated that his family was at the sentencing hearing to support him and that if he were released, he would live with his parents. The appellant apologized to Hendrix and asked for his forgiveness.

The appellant's mother, Cynthia Steed, testified that the appellant was living with her at the time of the offense and that he could live with her if he were released. She said that the appellant "was raised properly[,] . . . and he knows right from wrong."

The appellant's father, Reginold Steed, Sr., testified that the appellant "was brought up in a home with both parents." He said that he had taught the appellant to work and attend church but that the appellant might have been occasionally misled. He said that the appellant

was a good person and had a good work history.

The appellant's presentence report was entered as an exhibit to the sentencing hearing. The report contained the following version of events espoused by the appellant:

> [While in a McDonald's drive-thru line with two juveniles,] I was struck from behind by a drunk driver in a Red dodge Ram pick-up. The two juveniles immediately got out and approached the passenger side door of the vehicle. After the two juveniles got out of the car I got out and viewed the damages that was done to my vehicle which was a football sized dent in my trunk, I then walked up to the passenger side door with intention on exchanging information with the driver to give to my insurance company but the manner in which the two juveniles approached the truck made it difficult for me to follow through with those plans. When I approached the passenger side door [one of the juveniles] was arguing with the two guys in the truck and then he hit . . . Hendrix . . . two times in the face. The passenger then reached for something in which we thought was a gun so we took off running around the building, the juveniles out ran me so I don't know exactly where they ran to but I ran to the parking lot next to the Mcdonald's. I then went back to my car where I discovered Mr. Hendrix was kicking my car door and trying to pull it off its hinges, so immediately I began to approach Mr. Hendrix to prevent him from damaging my car. When I approached him I punched him twice in the face and he then lost his footing and fell on his face. When he fell he attempted to get up so I started to kick him in the side and then on the side of his face. [A]t that time the juveniles ran over and started to kick him as well, when he stopped resisting and stop trying to get up is when we stopped kicking him which was all of 35 seconds maybe. We then got back in the car and left.

At the hearing, Hendrix testified that "we all have mistakes. We are human. I probably have done just as bad, if not worse." He said that he believed the appellant could "make a big step in his life if he tries." Hendrix asked the court to show the appellant leniency. Hendrix said that he had given his telephone number to the appellant's family so he could help the appellant find employment when he was released.

After considering the foregoing, the trial court sentenced the appellant to four and a

half years, denied judicial diversion, and denied alternative sentencing. On appeal, the appellant challenges the trial court's sentencing determinations.

## A. Judicial Diversion

First, we will address the trial court's denial of judicial diversion. Generally, it is within a trial court's discretion to grant or deny judicial diversion. See State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). As such, the trial court's decision will be overturned only if the court abused its discretion. Id. In other words, we will not interfere with the denial of judicial diversion if the record contains any substantial evidence to support the trial court's decision. Id. Moreover, we observe that "judicial diversion is similar in purpose to pretrial diversion and is to be imposed within the discretion of the trial court subject only to the same constraints applicable to prosecutors in applying pretrial diversion [under Tennessee Code Annotated section] 40-15-105." State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992).

A defendant is eligible for judicial diversion when he or she is found guilty or pleads guilty to a Class C, D, or E felony and has not previously been convicted of a felony or a Class A misdemeanor. See Tenn. Code Ann. § 40-35-313(a)(1)(B). Additionally, in determining whether to grant a defendant judicial diversion, the trial court must consider all of the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the status of the defendant's physical and mental health, and (6) the deterrence value to the defendant and others. State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App. 1997). The record must reflect that the trial court has taken all of the factors into consideration, and "we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision." State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). Furthermore, "[t]he court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others." Id.

The trial court acknowledged that the appellant was eligible for judicial diversion. The court found that the appellant's physical and mental health did not weigh against the granting of diversion. In examining the appellant's amenability to correction, his prior criminal record, and his social history, the court observed that the appellant's presentence report reflected that the appellant was adjudicated delinquent in 2005 for assault and disorderly conduct, and he was granted "some type of probation." The appellant was adjudicated delinquent in 2007 for vandalism and in 2008 for possession of cocaine with intent to sell; the appellant was granted probation for the possession of cocaine offense. As an adult, the appellant was convicted of resisting a stop and frisk and was placed on probation; that

-8-

conviction occurred approximately one month prior to the instant offense. The trial court found that the appellant's failure to comply with the terms of probation and his continued violations of the law indicated that the appellant was not amenable to correction.

The court found that the circumstances of the offense also weighed against diversion, noting that Hendrix suffered a "very serious attack" in which he "was severely beaten, kicked and injured and wound up going to the hospital and had several broken bones in his face and severe bruising and bleeding about the body." The court stated that the attack was "unprovoked," noting that Hendrix's statement in the presentence report reflected that after the "initial striking of" Hendrix by the juveniles, the appellant hit him in the face, kicked him as he lay on the ground, and rendered him unconscious. The court cited McDaniel's testimony that the assault lasted for five minutes. The court also said that Hendrix suffered extensive injuries which caused him months of pain.

The appellant contends that "the trial court erred by stating that the assault was unprovoked" and by ignoring Hendrix's use of "racial slurs." However, the record belies this contention. The trial court recited the facts of the offense and noted that harsh words were uttered by the appellant, the juveniles, and Hendrix. Nevertheless, the trial court weighed all of the factors and determined that the appellant was not a suitable candidate for judicial diversion. We conclude that the trial court did not abuse its discretion.

### B. Length of Sentence

Next, we will address the appellant's challenge to the length of the sentence imposed by the trial court. In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should also consider enhancement and mitigating factors, the

statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114 (2006); State v. Carter, 254 S.W.3d 335, 343-44 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence . . . [and are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 345-46.

The appellant summarily argues that "the trial court erred in the length of the sentence imposed." However, the appellant does not specifically argue what errors the trial court made in determining the length of the sentence.

The trial court correctly stated that the appellant was a standard, Range I offender who was convicted of a Class C felony; therefore, he was subject to a sentence between three and six years. See Tenn. Code Ann. §§ 39-13-102(a)(1)(A), (e)(1), and 40-35-112(a)(3). The trial court applied enhancement factor (1), that the appellant had prior criminal history. Tenn. Code Ann. § 40-35-114(1). Additionally, the trial court applied enhancement factor (16), that the appellant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult. Tenn. Code Ann. § 40-35-114(16). The court also stated that the appellant had failed to comply with the conditions of a sentence involving release in the community. Tenn. Code Ann. § 40-35-114(8). These enhancement factors are supported by the record before us.

The court also found that the appellant was a leader in the offense, noting that in the presentence report, the appellant stated that he knocked Hendrix to the ground and began kicking and beating him, after which the two juveniles joined in. Tenn. Code Ann. § 40-35-114(2). The "enhancement for being a leader in the commission of an offense does not require that the [appellant] be the sole leader but only that he be 'a' leader." State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). The record supports the trial court's application of this enhancement factor.

As the sole mitigating factor, the trial court found that the appellant was young, eighteen years old, when he committed this offense. We conclude that the trial court did not err in the application of any enhancement or mitigating factors. Therefore, we conclude that the trial court did not err in sentencing the appellant to four and a half years in the Tennessee Department of Correction.

## C. Alternative Sentencing

Finally, we will address the appellant's contention that the trial court erred by denying alternative sentencing. An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a). The appellant's sentence meets this requirement. Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6). The following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), may constitute "evidence to the contrary":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, a court should consider the defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. See Tenn. Code Ann. § 40-35-103(5).

The court stated that although the appellant apologized to Hendrix, the court did not "believe he feels like he did anything terribly wrong. I think he thinks that at least at the time he acted that he was justified in acting that way because someone had kicked his vehicle or had accidentally bumped his vehicle." This court has previously stated that "[t]he trial judge is in the best position to assess a defendant's credibility and potential for rehabilitation." State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999). The trial court also again noted the appellant's criminal history, his continued failure to conform to the law, and his failure to comply with the terms of probation. Therefore, the trial court found that the appellant was not a suitable candidate for alternative sentencing. We agree.

-11-

### III.  Conclusion

In sum, we conclude that the evidence was sufficient to sustain the appellant's conviction and that the trial court did not err in its sentencing determinations.  Accordingly, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE